**In re: PARTY CITY SECURITIES LITIGATION**

No. CIV.A. 99–1353(AJL).

United States District Court, D. New Jersey.

May 29, 2001.

Robert J. Berg, Bernstein Liebhard & Lifshitz LLP, Fort Lee, NJ, Joseph H. Weiss, James E. Tullman, Weiss & Yourman, New York, NY, for Plaintiffs.

Jeffrey Greenbaum, Sills Cummis Radin Tischman Epstein & Gross, P.A., Newark, NJ, for Defendant Party City Corp.

Stephen Greiner, Willkie Farr & Gallagher, New York City, for Defendant Party City Corp.

Jennifer L. Colyer, Fried Frank Harris Shriver & Jacobson, New York City, for Defendant David Lauber.

Bruce I. Goldstein, Saber, Schlesinger, Satz & Goldstein, Newark, NJ, for Defendant Steven Mandell.

Wayne A. Cross, Dewey Ballantine LLP, New York City for Defendant Steven Mandell.

## OPINION

LECHNER, District Judge.

This is an action for securities fraud brought on behalf of purchasers of Party City Corporation ("Party City") common stock ("Party City Stock"), seeking damages for violations of Sections 10(b) ("Section 10(b)") and 20(a) ("Section 20(a)") of the Securities Exchange Act of 1934 (the "Exchange Act"), as amended, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b–5 ("Rule 10b–5") promulgated thereunder, 17 C.F.R. § 240.10b–5, from Party City, Steven Mandell ("Mandell") and David Lauber ("Lauber") (collectively, the "Defendants"). The asserted class period is from 26 February 1998 through 18 March 1999 (the "Class Period"). Jurisdiction is alleged pursuant to 28 U.S.C. § 1331.

Currently pending is a motion to dismiss (the "Motion to Dismiss") the second amended complaint (the "Second Amended Complaint") pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure ("Rule 12(b)(6)").[1] For the reasons set

---

1. In support of the Motion to Dismiss, the Defendants submitted: a memorandum of law in support of the Motion to Dismiss (the "Moving Brief"), the affidavit of Stephen Greiner (the "Greiner Aff."), the affidavit of Jennifer L. Colyer (the "Colyer Aff."), the affidavit of Wayne A. Cross (the "Cross Aff."), and a reply memorandum of law in further support of the Motion to Dismiss (the "Reply Brief").

In opposition to the Motion to Dismiss, the Plaintiffs submitted a memorandum of law in

forth below, the Motion to Dismiss is granted.

*Facts* [2]

### A. *The Parties*

Party City is a Delaware Corporation with its principal place of business in Rockaway, New Jersey. Second Amended Complaint at ¶ 10. Party City is a retailer of party supplies which it markets through a nationwide network of discount stores. *Id.*

Mandell was the founder and former President, Chief Executive Officer and Director of Party City. *Id.* at ¶ 11. Mandell signed quarterly reports on Form 10–Q filed with the Securities and Exchange Commission (the "SEC"). *Id.* Mandell also issued statements on behalf of Party City. *Id.*

Lauber is the former Chief Financial Officer and Principal Accounting Officer and Director of Party City. *Id.* at ¶ 12. Lauber signed quarterly reports on Form 10–Q filed with the SEC. *Id.* Lauber also issued statements on behalf of Party City. *Id.*

### B. *Procedural History*

This action is a consolidation of several cases filed against Party City, Mandell and Lauber [3] seeking to recover for alleged violations of the Exchange Act.

By order, dated 13 September 1999, (the "13 September 1999 Order") plaintiffs (the "Plaintiffs") were directed to file a consolidated amended complaint (the "Consolidated Amended Complaint"). 13 September 1999 Order at 4. The 13 September 1999 Order further provided that within seven business days of service of the Consolidated Amended Complaint, the Defendants were to notify the Plaintiffs if they intended to move against the complaint and, if so, the basis for such a motion. *Id.* Within five business days of such notification, the Plaintiffs were required to advise the Defendants of their intention to either stand on the Consolidated Amended Complaint or to amend. *Id.*

On 18 October 1999, the Plaintiffs filed the Consolidated Amended Complaint. By letter, dated 27 October 1999, (the "27 October 1999 Letter") the Defendants notified the Plaintiffs of their intent to move to dismiss the Consolidated Amended Complaint, as well as the basis of such a motion. 27 October 1999 Letter, attached as Ex. B to the Greiner Aff. By letter, dated 3 November 1999, (the "3 November 1999 Letter") counsel for the Plaintiffs responded that they would "stand firm" on the Consolidated Amended Complaint. 3 November 1999 Letter, attached as Ex. E to the Greiner Aff.

On 3 December 1999, the Defendants served their motion to dismiss. Notwithstanding their previously stated decision to "stand firm" on the Consolidated Amended Complaint, the Plaintiffs included a footnote in their opposition to the motion asking for leave to again amend their complaint in the event the motion to dismiss was granted. Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss at 38 n. 12, attached as Ex. W to the Greiner Aff.

On 22 February 2000, a status conference was held (the "22 February 2000 Status Conference"). When questioned

---

opposition to the Motion to Dismiss (the "Opposition Brief").

**2.** The facts are taken from the Second Amended Complaint and are accepted as true. *See* pp. 297–98 *infra.*

**3.** Mandell and Lauber are collectively referred to as the "Individual Defendants."

about their request to amend the Consolidated Amended Complaint, the Plaintiffs responded that they had developed information they believed warranted further amendment. The Plaintiffs were subsequently permitted to file the Second Amended Complaint. The Second Amended Complaint was filed on 28 February 2000. Thereafter, the Defendants filed the instant Motion to Dismiss.[4]

## C. *Background*

As stated, Party City is a retailer of party supplies. Party City operates a network of company owned retail outlets in the United States and its franchisees operated outlets in the United States, Puerto Rico, Canada, Spain and Portugal.

The allegations in the Second Amended Complaint are based upon an "investigation made by and through [counsel]." Second Amended Complaint at Preamble. The Second Amended Complaint alleges Defendants disseminated materially false and misleading information concerning the financial condition of Party City in order to artificially inflate the price of Party City Stock. *Id.* at ¶ 1. The Second Amended Complaint further alleges the financial and accounting systems employed by Party City were in disarray, causing the financial results reported by Party City during the Class Period to be materially inaccurate and overstated. *Id.* at ¶ 30. The Second Amended Complaint asserts that as a result of the alleged misrepresentations and omissions of the Defendants, the true operating status and financial condition of Party City was not known. *Id.* It is alleged this misinformation caused Party City Stock to trade at artificially high prices during the Class Period. *Id.*

### 1. *Alleged Materially False and Misleading Statements*

The following press releases, reports and statements are alleged to have been materially false and misleading.

#### a. *The 26 February 1998 Press Release*

On 26 February 1998, Party City issued a press release (the "26 February Press Release") announcing its 1997 fourth quarter and year-end results. *Id.* at ¶ 26. The 26 February 1998 Press Release stated net income for the fourth quarter of 1997 increased 137% to $7,305,000, or $.57 per "diluted share," compared with net income of $3,077,000, or $.29 per diluted share, for 1996. *Id.* The 26 February 1998 Press Release further stated net income for fiscal year 1997 increased 104% to $7,670,000, or $.64 per diluted share, compared to net income of $3,756,000, or $.38 per diluted share, for fiscal year 1996. *Id.* Commenting on the 1997 fiscal year results, Mandell stated:

> We are delighted with the strong sales and earnings results Party City achieved in 1997. Despite our aggressive store opening schedule, we were able to manage our growth effectively, as evidenced by our improved operating margin. We are also very pleased with the 16% comparable store sales growth in 1997, compared with the 18% comparable store sales growth achieved in 1996. *These solid results are testimony to the management team and the support systems we have put into place to manage our expansion.*
>
> As we head into 1998, we have already made significant head way in our aggressive store opening schedule. We have opened six company-owned stores this year, as compared to two store openings at this point last year. We

---

4. Significantly, the Plaintiffs have not sought leave to amend the Second Amended Complaint in the event the instant Motion to Dismiss is granted.

have signed 38 leases for additional company-owned store locations to open in 1998. With such a healthy head start this early in the year, we are confident in our ability to accomplish our 1998 expansion plans.

*Id.* (quoting the 26 February 1998 Press Release) (emphasis in the Second Amended Complaint).

b. *The 1997 Form 10–K*

On 31 March 1998, Party City filed its 1997 Form 10–K (the "1997 Form 10–K") with the SEC. Second Amended Complaint at ¶ 28. In addressing its internal inventory controls, Party City stated:

The Company's management continuously reviews new and existing product selections to provide the widest and most current assortment of party supplies. In pursuit of this goal, management attends various industry trade shows including the National Annual Halloween Trade Show in Rosemont, Illinois and the Toy Fair in New York. In an effort to keep abreast of new and popular merchandise, management views presentations given specifically for the Company by its major vendors. *The Company utilizes its inventory tracking system to give the purchasing staff constant feedback on customers' preferences.*

All of the merchandise purchased by the Super Stores is shipped directly from suppliers to the stores. *The purchasing decisions and inventory control are facilitated by the use of sophisticated point-of-sale inventory control technology.* Almost all merchandise is bar coded either by the supplier prior to delivery or at the time of receipt at the store. Consistent with the Party City Super Store concept, almost all inventory is displayed on the shelves with little or no space used for stocking.

*The MIS system is a vital tool for increasing the efficiency of store operations.* The Company believes that its management information system is an important factor in allowing the Company to support its rapid growth and enhance its competitive position in the industry. Through the MIS system, store managers are able to quickly evaluate the sales performance of their stores and of individual items in their stores, while also replenishing stock shelves in a timely fashion. Typically, *merchandise is received already bar coded, enabling managers to control inventory and pricing by SKU, to manage assortment within a category, and to analyze gross margins and inventory turnover.*

*Id.* at ¶¶ 28–29 (quoting the 1997 Form 10–k) (emphasis in the Second Amended Complaint).

c. *The 9 April 1998 Press Release*

On 9 April 1998, Party City announced its sales results for the first quarter of 1998 (the "9 April 1998 Press Release"). Second Amended Complaint at ¶ 31. The 9 April 1998 Press Release reported revenues for the first quarter of 1998 increased 179% to $40.7 million, up from $14.6 million for the same period in 1997. The 9 April 1998 Press Release further reported sales from company-owned stores for the quarter ended 31 March 1998 increased 206% to $38.7 million, up from $12.6 million in the first quarter of 1997. *Id.*

Party City also announced:

Party City opened a total of 14 new stores during the first quarter, 12 of which are company-owned and two of which are franchised. In addition, one franchise store was acquired during the quarter, located in the Miami, Florida market. As of March 31, 1998, a total of 288 Party City stores were in operation, compared to 209 stores last year, an

increase of 38%. As of April 1, 1998, additional leases for 38 company-owned stores and four franchise stores have been signed for openings this year.

*Id.* (quoting the 9 April 1998 Press Release).

The 9 April 1998 Press Release quoted Mandell as stating:

> We are pleased with our continued strong sales results in the first quarter. We expect the calendar shift of Easter into the month of April to help fuel continued sales growth in the second quarter, as initial sales results look solid.

Second Amended Complaint at ¶ 31 (quoting the 9 April 1998 Press Release).

### d. *The 23 April 1998 Press Release*

On 23 April 1998, Party City announced its financial results for the first quarter of 1998 (the "23 April 1998 Press Release"). Second Amended Complaint at ¶ 32. The 23 April 1998 Press Release noted that while Party City had experienced a net loss of $.10 per share for the period, total revenues for the period increased 179% to $40.7 million, up from $14.6 million for the same period in 1997. *Id.* Addressing the results for the first quarter of 1998, Mandell stated:

> We are pleased with the results we achieved in the first quarter. Due to the calendar shift of Easter this year, we expanded our promotional program during the month of March and were successful in generating store traffic and sales. We were able to do this and still improve margins for the quarter versus a year ago. Early sales indications in the month of April thus far are solid, which positions us well for the remainder of the quarter.
>
> During the first quarter we exceeded our internal store opening plan by opening 12 company-owned stores. The store we opened in Toledo, Ohio is in a

new market for Party City, and stores opened in San Antonio, California, Florida and the New York metropolitan area help to further penetrate these existing markets. *We are benefitting from our expanded infrastructure that has been put in place to support our growth.* For example, our broadened real estate team enables us to better canvas the country as we continue to look for home run store locations. To date, we have an additional 37 leases signed for 1998 openings, including new markets such as Seattle, Boston, Kansas City and Columbus, Ohio.

*Id.* (quoting the 23 April 1998 Press Release) (emphasis in the Second Amended Complaint).

### e. *The 9 July 1998 Press Release*

On 9 July 1998, Party City announced its sales results for the second quarter and first six months of 1998 (the "9 July 1998 Press Release"). Second Amended Complaint at ¶ 35. The 9 July 1998 Press Release stated the total revenues for the second quarter of 1998 increased 151.9% to $56.6 million. *Id.* The 9 July 1998 Press Release further stated revenues in the first six months of 1998 increased 162.4% to $97.3 million. *Id.* The 9 July 1998 Press Release accentuated the rapid growth Party City was experiencing:

> Party City opened a total of 20 new stores during the second quarter, 15 of which are company-owned and five of which are franchised. As of the end of the second quarter a total of 308 Party City stores were in operation, compared to 224 stores last year, an increase of 37.5%. Additionally, two new company-owned stores opened in early July, with the associated pre-opening costs booked as incurred in the second quarter. As of July 8, 1998, additional leases for 33 company-owned stores and six franchise

stores have been signed for openings this year.

*Id.* (quoting the 9 July 1998 Press Release).

Mandell commented:

The solid sales results we achieved in the second quarter are on target with our internal plan. Our 1998 store opening schedule is also tracking to our expectations. With 29 new company-owned stores already opened and another 33 signed leases, we are well positioned to reach our store opening goal for the year.

Second Amended Complaint at ¶ 36 (quoting the 9 July 1998 Press Release).

### f. *The 23 July 1998 Press Release*

On 23 July 1998, Party City issued a press release over the *Business Wire* announcing financial results for the second quarter and six months ended 30 June 1998 (the "23 July 1998 Press Release"). Second Amended Complaint at ¶ 39. The 23 July 1998 Press Release reported net income for the second quarter increased 16.1% to $1,042,000, or $.08 per share on both a basic and diluted basis, compared to net income of $897,000 or $.07 per share for the same period in 1997. *Id.* Party City reported a net loss for the first six months of 1998 of $229,000 or $.02 per share on both a basic and diluted basis, as compared to net income of $609,000 or $.05 per share for the same period in 1997. *Id.* Party City attributed the net loss for the first six months to a higher interest expense, resulting from the efforts of Party City to fund its aggressive growth, and to higher pre-opening expenses due to the greater number of stores opened in 1998 versus 1997. *Id.*

Mandell commented:

We are pleased to report our strong sales and earnings results for the second quarter. Earnings in the period were driven by our ability to improve store contribution margins while leveraging our G & A expenses over a wider sales base. We were able to achieve these improved results despite the significant pre-opening expenses incurred in the quarter due to our aggressive store expansion plans. We are confident that we will continue to efficiently execute our operating strategy and expect to meet our stated goals for the year.

*Id.* (quoting the July 1998 Press Release).

### g. *The 14 August 1998 Form 10-Q*

On 14 August 1998, Party City filed its Form 10-Q, for the quarter ended 30 June 1998 with the SEC (the "14 August 1998 Form 10-Q"). Second Amended Complaint at ¶ 42. The 14 August 1998 Form 10-Q was signed by Mandell and by Lauber. *Id.* The 14 August 1998 Form 10-Q repeated the financial results set forth in the 23 July 1998 Press Release. *Id.*

### h. *The 2 September 1998 Press Release*

On 2 September 1998, Party City issued a press release (the "2 September 1998 Press Release") announcing it expected to report a net loss of between $.15 to $.18 per fully diluted share for the third quarter ending 30 September 1998. *Id.* at ¶ 46. Party City stated this expectation was based upon lower than anticipated sales results for the months of July and August. *Id.* Party City asserted the lower sales were due to less aggressive promotional pricing than in the comparable period the prior year, a more aggressive new store expansion effort, and delays in the acquisitions of five franchise stores. *Id.*

Party City stated it believed its new store openings and franchise acquisitions had positioned Party City well for the important Halloween selling season. *Id.* Party City further stated "management expects a portion of the revenues and in-

come shortfall in the third quarter will be recouped in the fourth quarter of 1998 and remains comfortable that full year results will be in line with expectations." *Id.* (quoting the 2 September 1998 Press Release).

#### i. *The 3 September 1998 Star–Ledger Interview*

On 3 September 1998, Lauber gave an interview to the *Newark Star Ledger* (the "3 September 1998 *Star–Ledger* Interview"). Second Amended Complaint at ¶ 50. Lauber addressed the 34% drop in the price of Party City Stock that had resulted from the release of expected third quarter numbers in the 2 September 1998 Press Release. *Id.* Lauber stated the expected third quarter loss was tied to the costs of opening 52 new stores, compared with 34 new stores the prior year. Lauber stated "it was imperative to get these stores open in time for Halloween" so Party City could capture more business during its busiest season. *Id.* (quoting the 3 September 1998 *Star–Ledger* Interview). Addressing the quarterly shortfall, Lauber said Party City made the mistake of offering shoppers fewer store-circular bargains that year. *Id.* Lauber explained: "We thought there was an opportunity to pick up some dollars in our margins, so we did not promote on price as strongly in July and August.... It was an error on our part. But we're back on track." *Id.*

#### j. *The 3 September 1998 Dow Jones Interview*

On 3 September 1998, Lauber gave an interview to the *Dow Jones News Service* (the "3 September 1998 *Dow Jones* Interview"). Second Amended Complaint at ¶ 52. Lauber told *Dow Jones* he did not understand why investors had "been so skittish" about the stock: "The real issue is that the fundamentals of this business remain intact." *Id.* (quoting the 3 September 1998 *Dow Jones* Interview). Lauber asserted Party City would recover some of the third quarter losses in the fourth quarter. Second Amended Complaint at ¶ 52.

Lauber stated he was comfortable with the estimates of several analysts that earnings would be $.93 per share for 1998. *Id.* Lauber noted that, given recent activity in the stock market, some investors may have been looking for reasons to sell Party City Stock. *Id.* Lauber, however, maintained Party City was different from its competitors in that Party City offered a deeper selection, had a better inventory system, and received better prices because of its purchasing power. *Id.* Lauber also said that concerns about inventory levels were overblown: "We're very comfortable with our inventory levels." *Id.* (quoting the 3 September 1998 *Dow Jones* Interview).

#### k. *The 8 October 1998 Press Release*

On 8 October 1998, Party City issued a press release (the "8 October 1998 Press Release") announcing its sales results for the third quarter and nine months ended 30 September 1998. Second Amended Complaint at ¶ 58. The 8 October 1998 Press Release reported revenues for the third quarter of 1998 increased 108.6% to $58.4 million, and sales from company-owned stores were reported to have increased 117.9% to $56.0 million. *Id.* Total revenues for the nine months ended 30 September 1998 were reported to have increased 139.2% to $155.7 million, up from $65.1 million for the same period in 1997. *Id.* Mandell commented that

during the third quarter, we opened 52 stores and entered a number of new, key markets including Boston, Kansas City and Salt Lake City. Our aggressive push during the quarter to open more stores, combined with the strong rebound in our September sales, places us in an excel-

lent position to capitalize on the important Halloween season.

*Id.* (quoting the 8 October 1998 Press Release).

### 1. *The 22 October 1998 Press Release*

On 22 October 1998, Party City issued a press release (the "22 October 1998 Press Release") announcing its financial results for the third quarter of 1998. Second Amended Complaint at ¶ 60. The 22 October 1998 Press Release reported a net loss of $0.17 per share for the third quarter compared with a net loss of $0.02 per share for the same period in the prior year. *Id.* Mandell commented:

> Now that the third quarter is behind we are in a stronger position than ever to capitalize on the Halloween selling season.... [Our new store opening] schedule is an aggressive yet prudent level of new store activity for the company. We believe that 50 to 60 new company-owned stores will enhance our leading competitive position within the party goods industry.

*Id.* at ¶ 60 (quoting the 22 October 1998 Press Release).

### m. *The 16 November 1998 Form 10–Q*

On 16 November 1998, Party City filed its Form 10–Q for the quarter ended 30 September 1998 with the SEC (the "16 November 1998 Form 10–Q"). Second Amended Complaint at ¶ 65. The 16 November 1998 Form 10–Q was signed by Mandell and Lauber. *Id.* The 16 November 1998 Form 10–Q repeated the financial results for the third quarter of 1998 and nine months ended 30 September 1998 set forth in the 8 October 1998 Press Release. *Id.*

### n. *The 19 November 1998 Press Release*

On 19 November 1998, Party City issued a press release (the "19 November 1998 Press Release") announcing its sales results for the month of October 1998. *Id.* at ¶ 68. Party City reported total revenues for October increased 82.5% to $85.4 million, up from $46.8 million for the same period in 1997. *Id.* Mandell commented:

> We are very excited to have exceeded our same store sales goal for the month of October. We attribute the 11.4% increase to a well executed direct mail advertising campaign, strong in-store marketing and merchandising and to the depth and breadth of our Halloween product offering.... Sales were strong across all regions, with particularly strong results in Chicago, Detroit and Minneapolis. Our Class of 1998 new stores performed above plan and experienced a stronger first Halloween than any other class year in the Company's history.... We are pleased with our strong results in October, which is [sic] as important to our business as December is for most retailers. The combination of our solid comp store gain, the performance of our new stores and the excellent execution of our business during this important time of year gives Party City a solid platform from which to further grow the business.

*Id.* (quoting the 19 November 1998 Press Release).

### o. *The 4 January 1999 Press Release*

On 4 January 1999, Party City issued a press release (the "4 January 1999 Press Release") announcing its sales results for the fourth quarter and year ended 31 December 1998. Second Amended Complaint at ¶ 71. The 4 January 1999 Press Release reported total revenues for the 1998 fourth quarter increased 81.5% to $138.7 million and total revenues for 1998 fiscal year increased 108.0% to $294.3 million. *Id.* Mandell commented:

Our comparable store performance reflects a strong start to the quarter due to our healthy Halloween season sales results. We were able to build on that momentum with an effective promotional program that helped to drive traffic throughout the November and December holiday selling season. These results underscore the excitement generated by our super store concept and our leading position in the party supply industry.

*Id.* (quoting the 4 January 1999 Press Release).

### p. *The 1 March 1999 Press Release*

On 1 March 1999, Party City issued a press release (the "1 March 1999 Press Release") stating that in response to shareholder inquiries, Party City was offering its comments on the then current status of its year-end audit process. Second Amended Complaint at ¶ 74. Party City reported:

The Company is currently in the process of completing its year-end audit. The audit has taken longer than anticipated due to growth of the business; having 85% more company-owned stores as compared to year-end 1997. Part of this process is the taking and reconciling of physical inventories in stores. Party City expects to report its year-end financial results the week of March 28, 1999. The Company is approximately halfway through the inventory process, and, based on currently available information, has determined that inventory shrinkage levels and gross profit margins in company-owned stores are within the Company's historical range as well as its year-end budget. Also, based on preliminary results, total pre-tax operating expenses in the fourth quarter of 1998 were approximately $1 million higher than planned and, therefore, will

have a corresponding effect on net income and earnings per share results.

*Id.* (quoting the 1 March 1999 Press Release).

### q. *The 19 March 1999 Press Release*

On 19 March 1999, prior to the opening of trading, Party City issued a press release (the "19 March 1999 Press Release") which stated:

Party City Corporation (Nasdaq: PCTY) announced today that its year-end audit is continuing, but it is taking longer than expected due to various difficulties associated with implementing new and upgrading existing financial reporting and accounting systems that were required, in part, to accommodate the substantial growth of its business, as well as the time and difficulties associated with taking a physical inventory of the increased number of stores and recent turnover in its Finance Department. The Company is working diligently with its independent auditors to complete the audit as soon as possible. While the Company believed earlier this month that the audit would be completed by month end, at this time the Company does not expect that the audit will be completed by that date and is unable to indicate when the audit will be completed.

The Company will be in default of certain reporting covenants under its existing $60 million secured credit facility as a result of the delay in completing the audit, and will be in default of certain financial covenants as of December 31, 1998. The Company is engaged in discussions with its lenders. In the event the Company is unable to resolve these issues with its lenders, the lenders may be able to exercise certain remedies, including acceleration of repayment.

Steven Mandell Chairman and Chief Executive Officer of Party City, stated, "We are extremely disappointed with the difficulties we have encountered in completing this year's audit and we have begun to take corrective action to avoid these issues in the future. Regarding communications with our investors, we intend to hold a conference call shortly after our annual results are released. We do not expect to make further announcements concerning the year-end results until the audit is completed."

Second Amended Complaint at ¶ 76 (quoting the 19 March 1999 Press Release).

The Second Amended Complaint alleges investors were surprised by the announcement the year-end audit of Party City had been delayed indefinitely, and that Party City was in default of certain reporting covenants under its then existing $60 million secured credit facility. Second Amended Complaint at ¶ 77. The Second Amended Complaint further alleges investors were not aware Party City was in default of certain financial agreements as of 31 December 1998, and that the financial reporting and accounting systems of Party City were in disarray. *Id.* During the first day of trading following the 19 March 1999 Press Release, the price of Party City Stock fell $3⁹⁄₁₆ per share to $4 per share, representing a loss of more than forty-five percent. *Id.*

As mentioned, the Second Amended Complaint alleges Defendants disseminated materially false and misleading information concerning the financial condition and business prospects of Party City. *Id.* at ¶ 84. According to the Second Amended Complaint, because the financial and accounting systems of Party City were in disarray, the financial results reported by Party City during the Class Period were materially inaccurate and overstated and failed to conform to Generally Accepted Accounting Principals ("GAAP"). *Id.* The Second Amended Complaint asserts that the material misrepresentations and omissions of the Defendants regarding the operating results and financial condition of Party City caused Party City Stock to trade at artificially inflated prices during the Class Period. *Id.*

#### 2. *Scienter Allegations*

The Second Amended Complaint alleges Defendants acted with scienter in that they (1) knew or recklessly disregarded that the public documents and statements issued or disseminated in the name of Party City were materially false and misleading, (2) knew or recklessly disregarded that such statements or documents would be issued or disseminated to the investing public, and (3) knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents. *Id.* at ¶ 87.

The Second Amended Complaint further alleges that the Individual Defendants engaged in a scheme to inflate the price of Party City Stock in order to (1) protect and enhance their executive positions and the substantial compensation and prestige they obtained thereby, (2) allay concerns about Party City's financial problems and (3) enhance the value of their personal Party City Stock and stock options, allowing for profitable insider sales and purchases.[5] *Id.* at ¶ 89.

---

5. The Second Amended Complaint alleges Lauber sold all of his Party City Stock during the Class Period at inflated prices. Second Amended Complaint at ¶ 90. According to the Second Amended Complaint, Lauber realized more than $2 million in proceeds from such sales. *Id.* The Second Amended Complaint asserts that both the quantity and the timing of such sales were "suspicious" and support an inference of scienter. *Id.*

*Discussion*

### A. Standard for Dismissal Under Rule 12(b)(6)

A complaint may be dismissed pursuant to Rule 12(b)(6) for failure to state a claim where it appears beyond doubt no relief could be granted under any set of facts which could be proved consistent with the allegations. *Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 811, 113 S.Ct. 2891, 125 L.Ed.2d 612 (1993); *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984); *Semerenko v. Cendant Corp.*, 223 F.3d 165, 173 (3d Cir.2000) (citations omitted); *In re Warfarin Sodium Antitrust Litig.*, 214 F.3d 395, 397–98 (3d Cir.2000).

All allegations set forth by a plaintiff are taken as true and all reasonable factual inferences are drawn in his or her favor. *Sutton v. United Airlines, Inc.*, 527 U.S. 471, 475, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999); *Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 633, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999); *Semerenko*, 223 F.3d at 173.

■ A complaint may not be dismissed unless it appears beyond doubt "the facts alleged in the complaint, even if true, fail to support the claim." *In re Warfarin Sodium*, 214 F.3d 395, 397 (3d Cir.2000); *Trump Hotels and Casino Resorts, Inc. v. Mirage Resorts, Inc.*, 140 F.3d 478, 483 (3d Cir.1998). Legal conclusions made in the guise of factual allegations, however, are given no presumption of truthfulness. *Papasan v. Allain*, 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986); *Morse v. Lower Merion School Dist.*, 132 F.3d 902, 906 (3d Cir.1997) ("[A] court need not credit a complaint's 'bald assertions' or 'legal conclusions' when deciding a motion to dismiss"); *Syncsort Inc. v. Sequential Software, Inc.*, 50 F.Supp.2d 318, 325 (D.N.J.1999); *In re MobileMedia Sec. Litig.*, 28 F.Supp.2d 901, 922 (D.N.J.1998).

A District Court reviewing the sufficiency of a complaint has a limited role. The issue is not "whether the plaintiffs will ultimately prevail" but "whether they are entitled to offer evidence to support their claims." *Langford v. City of Atlantic City*, 235 F.3d 845, 847 (3d Cir.2000); *see also In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1420 (3d Cir.1997); *Syncsort*, 50 F.Supp.2d at 325; *In re MobileMedia*, 28 F.Supp.2d at 922. Generally, when conducting such an inquiry, material beyond the pleadings may not be considered. *In re Burlington Coat Factory*, 114 F.3d at 1426.

■ A court may properly refer, however, to the factual allegations contained in other documents, such as documents referred to in the complaint and matters of public record, if the claims of the plaintiff are based upon those documents. *In re Burlington Coat Factory*, 114 F.3d at 1426; *In re Westinghouse Sec. Litig.*, 90 F.3d 696, 707 (3d Cir.1996); *Gannon v. Continental Ins. Co.*, 920 F.Supp. 566, 574 (D.N.J.1996). In other words, such documents must be "integral to or explicitly relied upon in the complaint." *In re Burlington Coat Factory*, 114 F.3d at 1426 (citation and internal quotations omitted). The reason for this rule is to prevent

> [t]he situation in which a plaintiff is able to maintain a claim of fraud by extracting an isolated statement from a document and placing it in the complaint,

---

In addition, the Second Amended Complaint alleges Mandell sold 125,000 shares of Party City Stock during the Class Period. *Id.* at ¶ 91. According to the Second Amended Complaint, Mandell realized more than $2.8 million in proceeds from those sales. *Id.* The Second Amended Complaint asserts that both the quantity and the timing of such sales was "suspicious" and strongly support an inference of scienter. *Id.*

even though if the statement were examined in the full context of the document, it would be clear that the statement was not fraudulent.

*Id.* Under these circumstances, reference to documents outside of the complaint does not convert a motion to dismiss into a motion for summary judgment.

### B. *The Exchange Act*

In general, the Exchange Act regulates post-distribution trading. *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N .A.,* 511 U.S. 164, 171, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994). The Exchange Act embraces a "fundamental purpose ... [of] substitut[ing] a philosophy of full disclosure for the philosophy of caveat emptor." *Id.* The Exchange Act is part of a detailed scheme of civil liability.

### 1. *Section 10(b) and Rule 10b–5*

Count One of the Second Amended Complaint alleges violations of Section 10(b) and Rule 10b–5. Second Amended Complaint at ¶¶ 93–101. Through Section 10(b), Congress prohibited manipulative or deceptive acts in connection with the purchase or s ale of securities. 15 U.S.C. § 78j; *see also* Rule 10b–5; 17 C.F.R. § 240.10b–5.

To establish a claim under Section 10(b) and Rule 10b–5, a plaintiff must plead

(1) that the defendant made a misrepresentation or omission of (2) a material (3) fact; (4) that the defendant acted with knowledge or recklessness and (5) that the plaintiff reasonably relied on the misrepresentation or omission and (6) consequently suffered damage.

*In re Advanta Corp. Sec. Litig.,* 180 F.3d 525, 537 (3d Cir.1999).

### 2. *Rule 9(b)*

Because a Rule 10b–5 claim is a "fraud" claim, the Plaintiffs must satisfy the pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure ("Rule 9(b)"). *In re Burlington Coat Factory,* 114 F.3d at 1417; *In re Westinghouse,* 90 F.3d at 710. Rule 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed.R.Civ.P. 9(b). The purpose of the heightened pleading requirement is to give defendants "notice of the claims against them, [to] provide an increased measure of protection for their reputations, and [to] reduce the number of frivolous suits brought solely to extract settlements." *In re Burlington Coat Factory,* 114 F.3d at 1418.

In order to satisfy Rule 9(b) in connection with a Rule 10b–5 claim, a plaintiff must plead with particularity (1) a specific misrepresentation of material fact, (2) the knowledge by defendants of its falsity, (3) the ignorance by the plaintiff of its falsity, (4) the intention of defendants that it should be acted upon and (5) that plaintiff acted upon it to his or her detriment. *In re Westinghouse,* 90 F.3d at 710.

Consequently, Rule 9(b) demands increased specificity in the pleadings to establish violations of Section 10(b) and Rule 10b–5. Pursuant to Rule 9(b), allegations concerning misrepresentations of material fact must be pleaded in greater detail. *Stevelman v. Alias Research Inc.,* 174 F.3d 79, 84 (2d Cir.1999); *see e.g. In re Burlington Coat Factory,* 114 F.3d at 1417–18 (holding that pursuant to Rule 9(b), "where plaintiffs allege that defendants distorted certain data disclosed to the public by using unreasonable accounting practices, ... plaintiffs [must] state what the unreasonable practices were and how they distorted the disclosed data");

*Shapiro v. UJB Financial Corp.*, 964 F.2d 272, 285 (3d Cir.1992) (citing *In re Craftmatic Sec. Litig.*, 890 F.2d 628, 646 (3d Cir.1989)) (finding that Rule 9(b) requires plaintiffs to "accompany the allegations with a statement of fact upon which their allegation is based").

■ The particularity requirement of Rule 9(b) is "relaxed somewhat where the factual information is peculiarly within the defendant's knowledge or control." *In re Burlington Coat Factory*, 114 F.3d at 1418; *Shapiro*, 964 F.2d at 285; *In re Craftmatic*, 890 F.2d at 645. Even under a relaxed application of Rule 9(b), however, "boilerplate and conclusory allegations will not suffice." *In re Burlington Coat Factory*, 114 F.3d at 1418; *Shapiro*, 964 F.2d at 285. Instead, "[p]laintiffs must accompany their legal theory with factual allegations that make their theoretically viable claim plausible." *In re Burlington Coat Factory*, 114 F.3d at 1418; *Stevelman*, 174 F.3d at 84; *Shapiro*, 964 F.2d at 285; *In re Craftmatic*, 890 F.2d at 645.

### 3. The Private Securities Litigation Reform Act

Complaints alleging securities fraud must also comply with the Private Securities Litigation Reform Act of 1995 (the "PSLRA"). 15 U.S.C. ¶ 78u–4 *et seq.; Oran v. Stafford*, 226 F.3d 275, 288 (3d Cir.2000). Congress enacted the PSLRA in an effort to curb abuse in private securities litigation, especially the filing of so-called "strike" suits. S.Rep. No. 104–98, at 4 (1995), reprinted in 1995 U.S.C.C.A.N. 679, 683. The Committee on Banking, Housing and Urban Affairs reported that:

The Committee heard substantial testimony that today certain lawyers file frivolous "strike" suits alleging violations of Federal securities laws in the hope that defendants will quickly settle to avoid the expense of litigation. These suits, which unnecessarily increase the cost of raising capital and chill corporate disclosure, are often based on nothing more than a company's announcement of bad news, not evidence of fraud. All too often, the same "professional" plaintiffs appear as name plaintiffs in suit after suit.

S.Rep. No. 104–98, at 4 (1995), reprinted in 1995 U.S.C.C.A.N. 679, 683.

The PSLRA seeks to "curtail the filing of abusive lawsuits" through the establishment of a "uniform and stringent pleading requirement." *Id.* at 15, reprinted 1995 U.S.C.C.A.N. at 694. To that end, the PSLRA requires a complaint, which asserts a Section 10(b) claim, set forth "each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint *shall state with particularity all facts on which that belief is formed.*" 15 U.S.C. § 78u–4(b)(1) (emphasis added).

In addition, to allege scienter sufficiently, the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2); *Oran*, 226 F.3d at 288. A complaint that fails to meet these stringent pleading requirements must be dismissed. 15 U.S .C. 78u–4(b)(3)(A).[6]

**6.** As will be discussed *infra*, pursuant to the PSLRA, certain forward-looking statements qualify for safe harbor treatment and are protected from Section 10(b) and Rule 10b–5 liability. 15 U.S.C. § 78u–5. A "statement is forward-looking if, *inter alia*, it is 'a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items.' " *In re Advanta*, 180 F.3d at 535 (quoting 15 U.S.C. § 78u–5(i)(1)(A)).

Defendants argue the Section 10(b) claim of the Plaintiffs fails to meet the pleading requirements of both the PSLRA and Rule 9(b). Moving Brief at 11–18.

a. *15 U.S.C. § 78u–4(b)(1)*

i. *Failure to Allege Fraud with Particularity*

■ As discussed above, plaintiffs asserting Section 10(b) claims must specifically identify the statements which they contend were false and misleading. Simply referring to a series of public statements and then alleging, in a general and conclusory manner, that those disclosures were false or misleading is insufficient. *See In re Burlington Coat Factory*, 114 F.3d at 1418.

The Second Amended Complaint alleges that virtually every disclosure of Party City's financial results during the Class Period was false and misleading.[7] *See* Second Amended Complaint at ¶¶ 26, 28, 31, 32, 35, 39, 42, 46, 50, 52, 58, 60, 65, 68, 71, 74, 76. The Plaintiffs, nevertheless, do not specify which figures in Party City's financial statements they claim are inaccurate, much more by how much. Indeed, the Second Amended Complaint does not identify a single number or a single line item in any financial disclosure which the Plaintiffs allege was wrong. The Plaintiffs, moreover, fail to specify whether they claim the earnings were wrong, the sales were wrong, or the expenses were wrong.[8] At a minimum, such basic facts should be pleaded with specificity. *See In re Burlington Coat Factory*, 114 F.3d at 1417–18 ("[W]here plaintiffs allege that defendants distorted certain data disclosed to the public by using unreasonable accounting practices, . . . plaintiffs [must] state what the unreasonable practices were and how they distorted the disclosed data."); *Gross v. Summa Four, Inc.*, 93 F.3d 987, 996 (1st Cir.1996) (plaintiffs failed to "allege[ ] the amount of the putative overstatement or the net effect it had on the company's earnings"), *superseded by statute as stated in Greebel v. FTP Software, Inc.*, 194 F.3d 185 (1st Cir.1999); *Pell v. Weinstein*, 759 F.Supp. 1107, 1119 (M.D.Pa.1991) ("plaintiffs do not even attempt to identify the errors in the financial statements or the

A forward-looking statement will not qualify for safe harbor treatment if the plaintiff alleges the statement was made with "actual knowledge . . . that the statement was false or misleading." 15 U.S.C. § 78u–5(c)(1)(B)(i); *see also In re Advanta*, 180 F.3d at 535.

7. As mentioned, such disclosures include (1) Party City's audited financial statements for the year ended 31 December 1997, Second Amended Complaint at ¶¶ 28–30, (2) Party City's quarterly financial statements on Form 10-Q for the second and third quarters (but not the first quarter) of 1998, *id.* at ¶¶ 42–43, 65–67, (3) press releases and other disclosures regarding Party City's financial results for the fourth quarter and year ended 31 December 1997, for each of the first three quarters of 1998 and for various months during 1998, *id.* at ¶¶ 26–27, 31–34, 35–38, 39–41, 46–49, 58–59, 60–63, 68–70, and (4) press releases and other disclosures regarding Party

City's sales results for the fourth quarter and year ended 31 December 1998, *id.* at ¶¶ 71–73.

8. The Second Amended Complaint's attack on virtually every disclosure made by Party City and its failure to specifically identify any alleged inaccuracies is illustrated in Paragraphs 26–27. Paragraph 26 quotes from the 26 February 1998 press release which states, in part: "The Company also announced that it has received a letter of commitment from PNC Bank for a new, three year revolving credit facility which increases the Company's line of credit to $60 million from $20 million." Second Amended Complaint at ¶ 26. By alleging, in paragraph 27, that *all* of the "foregoing statements and financial results set forth in Paragraph 26 were materially false and misleading and lacked any reasonable basis," the Plaintiffs have swept even this statement into those they label as false and misleading.

amount of any inaccuracies"), *aff'd,* 961 F.2d 1568 (3d Cir.1992).

 The Plaintiffs, moreover, claim that Party City's systems were not functioning in a manner so as to produce reliable financial results in accordance with GAAP. Second Amended Complaint at ¶¶ 30, 34, 38, 41, 43, 49, 51, 53, 57, 59, 63, 67, 70, 73, 75. The Plaintiffs, however, do not specify which generally accepted accounting principle or principles Party City allegedly failed to observe. *Id.* Unsubstantiated allegations that the Defendants failed to comply with GAAP lack the particularity required by Rule 9(b) and the PSLRA. *See In re Burlington Coat Factory,* 114 F.3d at 1417–18; *In re Ikon Office Solutions, Inc.,* 66 F.Supp.2d 622, 633 (E.D.Pa.1999) ("Defendant is correct that plaintiffs may not merely allege violations of GAAP and GAAS" without identifying the unreasonable practices and stating how they distorted the financials).

In addition to the unparticularized allegations that Party City's financials were false and misleading, the Second Amended Complaint makes the following allegation with regard to virtually every Class Period disclosure:

> The foregoing statements and financial results ... were materially false and misleading and lacked any reasonable basis because, as defendants knew (or

were reckless in not knowing) and failed to disclose to the investing public, the Company's internal financial and accounting systems had failed to keep up with the Company's rapid and aggressive expansion of stores and were not functioning in a manner so as to produce reliable financial results and in accordance with GAAP. Indeed, as a result of high turnover in the Finance Department ... and the failure of the Company's internal financial and accounting systems to generate accurate financial information ... the Company's financial results ... were materially inaccurate and should not have been released to the investing public.

Second Amended Complaint at ¶¶ 27, 30, 34, 38, 41, 43, 47, 49, 51, 53, 57, 59, 63, 67, 70, 73, 75. The Plaintiffs, however, do not specify which "systems" were inadequate, how they were inadequate, which financial personnel left Party City or how these purported deficiencies affected the financial results. As discussed, such conclusory allegations are insufficient under Rule 9(b) and the PSLRA. *See In re Burlington Coat Factory,* 114 F.3d at 1418.

The Plaintiffs, moreover, have included certain additional allegations regarding various inventory and operational problems at Party City.[9] *See e.g.* Second

---

9. These include allegations that (1) store personnel "often" failed to enter merchandise into the inventory system, such that the computer "often" failed accurately to reflect goods on hand, Second Amended Complaint at ¶ 30(c), (2) "substantial quantities" and "categories" of merchandise arrived without bar-coded pricing stickers, making it difficult to track inventory, *id.,* (3) "many" small toy items and party favors were not properly scanned at store registers "often" operated by high school and college students who "oftentimes" simply gave such items away for free, *id.,* (4) unscanned or misscanned merchandise were "substantial enough" to render Party City's computerized inventory and sales

figures misleading, *id.,* (5) Halloween merchandise was stored haphazardly, with "costumes boxed with candles and glitter," making it difficult to track inventory at the end of the Halloween season, *id.* at ¶ 30(d), (6) "on-hand" inventory discrepancies, amounting to "many thousands of dollars" per month, were manually erased by "bringing the computer to zero," *id.* at ¶ 30(e), and (7) due to turnover "on the order of thirty percent per year," Party City's corporate headquarters finance staff was so overwhelmed that "garbage bags and boxes" of "paperwork" sent from the Party City stores sat in the mailroom, *id.* at ¶ 30(f).

Amended Complaint at ¶ 30. The Plaintiffs assert that such problems "ma[de] the Company's financial statements issued throughout the Class Period misleading." *Id.* at ¶ 30(g). The Plaintiffs, however, have provided no support for such allegations in the Second Amended Complaint.

For example, the Second Amended Complaint does not set forth a single specific occasion where a store employee failed to enter merchandise into the inventory system. In addition, the Second Amended Complaint does not identify any staff member or store involved, the time period when such events allegedly took place or quantify the amount of inventory not entered into the system. Similarly, the Second Amended Complaint fails to identify which particular financial statements during the Class Period were impacted by these alleged occurrences or by how much.

The Second Amended Complaint, moreover, lends no support to the allegation that turnover at Party City was "on the order of 30 percent." *Id.* at 30(f). The Second Amended Complaint does not mention any name, or even provide the title or rank, of any person who left Party City during the Class Period. Moreover, the Second Amended Complaint does not explain how such departures would have rendered the financial results unreliable and inaccurate.

Likewise, the Second Amended Complaint fails to allege any facts supporting the allegation that "garbage bags and boxes" full of "paperwork" sat in the mailroom at Party City's corporate headquarters. Indeed, the Second Amended Complaint does not allege the kinds of "paperwork" involved or how such "paperwork" had any

bearing on Party City's financial statements.

As mentioned, because a Rule 10b–5 claim is a "fraud" claim, the Plaintiffs must satisfy the pleading requirements of Rule 9(b). *In re Burlington Coat Factory,* 114 F.3d at 1417; *In re Westinghouse,* 90 F.3d at 710. Rule 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed. R.Civ.P. 9(b). The Second Amended Complaint fails to meet this stringent pleading requirement.[10]

### ii. *Failure to Allege Basis for Information and Belief Allegations*

■ Even if the Plaintiffs had adequately pleaded false and misleading statements with the required particularity, they are further required by the PSLRA to provide the basis for such allegations where, as here, those allegations are alleged on "information and belief." *See* 15 U.S.C. § 78u–4(b)(1). As mentioned, the PSLRA mandates that "if an allegation regarding [a] statement or omission is made on information and belief, the complaint *shall state with particularity all facts on which that belief is formed.*" *Id.* (emphasis added). In so drafting the PSLRA, "Congress intended to assure that the requirements of Rule 9(b) were met in all securities fraud cases, including those pled on information and belief." *In re Silicon Graphics, Inc. Sec. Litig.,* 970 F.Supp. 746, 752 (N.D.Cal.1997) (citing H.R. Conf. Rep. No. 104–369, at 41, reprinted in 1995 U.S.C.C.A.N. 730, 740).

The Plaintiffs contend that this heightened pleading standard is not applicable in the present matter. Opposition Brief at 20–23. According to the Plaintiffs, the

---

**10.** The case law cited in the Opposition Brief lends little support to the Plaintiffs' allegations regarding the sufficiency of their pleadings; the Plaintiffs primarily rely on outdated pre-Reform Act law. *See* Opposition Brief at 9–18.

allegations in the Second Amended Complaint are made "upon information and belief ..., based upon ... the *investigation made by and through [counsel]." Id.* (emphasis added).

■ Allegations made on the basis of an investigation of counsel, nevertheless, are the functional equivalent of allegations made upon information and belief.[11] *In re Nice Systems, Ltd. Sec. Litig.,* 135 F.Supp.2d 551, 568–69 (D.N.J.2001); *see also In re Silicon Graphics,* 183 F.3d at 985; *In re Theragenics Corp. Sec. Litig.,* 105 F.Supp.2d 1342, 1351 (N.D.Ga.2000); *In re PETsMART, Inc. Sec. Litig.,* 61 F.Supp.2d 982, 989 (D.Ariz.1999); *In re Green Tree Financial Corp. Stock Litig.,* 61 F.Supp.2d 860, 872 (D.Minn.1999); *In re Aetna,* 34 F.Supp.2d at 942. Therefore, because the Plaintiffs are pleading upon information and belief, the PSLRA requires that the Plaintiffs particularize all facts upon which their belief was formed, including the identities of unnamed "former employees." 15 U.S.C. § 78u-4(b)(1); *see also In re Nice Systems,* 135 F.Supp.2d at 570–72. This they have failed to do.

■ The language of a statute is the starting point when considering its meaning. *Williams v. Taylor,* 529 U.S. 420, 431, 120 S.Ct. 1479, 146 L.Ed.2d 435 (2000); *Richardson v. U.S.,* 526 U.S. 813, 818, 119 S.Ct. 1707, 143 L.Ed.2d 985 (1999); *U.S. v. Gregg,* 226 F.3d 253, 257 (3d Cir.2000). "Where the statutory language is plain and unambiguous, further inquiry is not required, except in the extraordinary case where a literal reading of the language produces an absurd result." *Idahoan Fresh v. Advantage Produce, Inc.,* 157 F.3d 197, 202 (3d Cir.1998); *see also U.S. v. Ron Pair Enterprises, Inc.,* 489 U.S. 235, 241, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989) (Where "the statute's language is plain, 'the sole function of the courts is to enforce it according to its terms.'") (quoting *Caminetti v. U.S.,* 242 U.S. 470, 485, 37 S.Ct. 192, 61 L.Ed. 442 (1917)).

■ "[I]f the statutory language is clear, a court must give [such language] effect unless this 'will produce a result demonstrably at odds with the intention of [the] drafters.'" *Government of the Virgin Islands v. Knight,* 989 F.2d 619, 633 (3d Cir.1993) (quoting *Griffin v. Oceanic Contractors, Inc.,* 458 U.S. 564, 570, 102 S.Ct. 3245, 73 L.Ed.2d 973 (1982)); *see also Williams,* 529 U.S. at 431, 120 S.Ct. 1479 ("We give the words of a statute their ordinary, contemporary, common meaning, absent an indication Congress intended them to bear some different import.") (citation and internal quotations omitted); *Gregg,* 226 F.3d at 257 ("Once the plain meaning of the statute is determined, it is conclusive except in rare cases in which the literal application of a statute will produce a result demonstrably at odds with the intention of the drafters.") (citation and internal quotations omitted).

■ When construing the language of a statute, "significance and effect" must be accorded "to every word." *Rake v. Wade,* 508 U.S. 464, 471, 113 S.Ct. 2187, 124 L.Ed.2d 424 (1993) (citations omitted); *see also Public Lands Council v. Babbitt,* 529

11. Rule 11(b) of the Federal Rules of Civil Procedure requires that allegations in a complaint be based upon either personal knowledge or information and belief. Fed.R.Civ.P. 11(b); *Simon DeBartolo Group, L.P. v. Richard E. Jacobs Group, Inc.,* 186 F.3d 157, 166 (2d Cir.1999). Because the investigation of counsel does not confer personal knowledge on Plaintiffs, the allegations are necessarily based upon information and belief. *In re Silicon Graphics, Inc. Sec. Litig.,* 183 F.3d 970, 985 (9th Cir.1999); *In re Aetna, Inc. Sec. Litig.,* 34 F.Supp.2d 935, 942 (E.D.Pa.1999).

U.S. 728, 746, 120 S.Ct. 1815, 146 L.Ed.2d 753 (2000) (a statute must "be construed in such a fashion that every word has some operative effect.") (quoting *U.S. v. Nordic Village, Inc.,* 503 U.S. 30, 36, 112 S.Ct. 1011, 117 L.Ed.2d 181 (1992)); *In re Top Grade Sausage, Inc.,* 227 F.3d 123, 129 (3d Cir.2000) ("[C]ourts are obliged to give effect, if possible, to every word Congress used.") (quoting *In re Cohn,* 54 F.3d 1108, 1115 (3d Cir.1995)). Accordingly, when interpreting a statute, words may not simply be read out of the statute. *See e.g. National Credit Union Admin. v. First National Bank & Trust Co.,* 522 U.S. 479, 502, 118 S.Ct. 927, 140 L.Ed.2d 1 (1998); *Morales v. Trans World Airlines,* 504 U.S. 374, 385, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992); *see also In re Nice Systems,* 135 F.Supp.2d at 570–72.

█ The plain language of the PSLRA indicates that a plaintiff may not plead some facts and withhold others. As mentioned, a complaint on information and belief "shall state with particularity *all facts* on which that belief is formed." 15 U.S.C. § 78u–4(b)(1) (emphasis added). Although the words "all" and "facts" are not defined in the PSLRA, the meaning of each is plain. "All" means "every member or individual component of." Black's Law Dictionary 74 (6th ed.1990). "Fact" is defined as "an event or circumstance." *Id.* at 591. "Facts" also include the names of confidential informants, employees, competitors and others who provide information which leads to the filing of a complaint under the Exchange Act. 141 Cong. Rec. H2849 (8 March 1995).

█ The plain language of the PSLRA dictates that plaintiffs pleading on information and belief set forth each and every event, circumstance, confidential informant, employee or others who supply data which leads to the drafting of the complaint. *See Immigration and Naturaliza-*

*tion Service v. Elias–Zacarias,* 502 U.S. 478, 482, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992) ("In construing statutes, we must, of course, start with the assumption that the legislative purpose is expressed by the ordinary meaning of the words used.") (citation and internal quotations omitted); *see also In re Nice Systems,* 135 F.Supp.2d at 570–72.

█ As discussed, moreover, "only the most extraordinary showing of contrary intentions from [legislative history] would justify a limitation on the 'plain meaning' of the statutory language." *Ries v. National Railroad Passenger Corp.,* 960 F.2d 1156, 1161 (3d Cir.1992) (quoting *Garcia v. U.S.,* 469 U.S. 70, 75, 105 S.Ct. 479, 83 L.Ed.2d 472 (1984)). While neither necessary nor appropriate for consideration in the present matter, the plain language and understanding of the PSLRA are reinforced by its legislative history.

█ In H.R. Conf. Rep. No. 104–369, Congress stated that its intent in promulgating the information and belief provision was to require that a "plaintiff . . . state with particularity *all* facts in the plaintiff's possession on which the belief is formed." H.R. Conf. Rep. No. 104–369, at 41, reprinted in 1995 U.S.C.C.A.N. at 740 (emphasis added). As the Supreme Court has commented, a conference report such as the one issued in connection with the passage of the PSLRA is "traditionally [an] authoritative indicator[ ] of legislative intent." *Northeast Bancorp, Inc. v. Board of Governors of Federal Reserve System,* 472 U.S. 159, 170, 105 S.Ct. 2545, 86 L.Ed.2d 112 (1985); *see also Garcia,* 469 U.S. at 76, 105 S.Ct. 479 ("[T]he authoritative source for finding the Legislature's intent lies in the Committee Reports on the bill, which 'represen[t] the considered and collective understanding of those Congressmen involved in drafting and study-

ing proposed legislation.'") (quoting *Zuber v. Allen*, 396 U.S. 168, 186, 90 S.Ct. 314, 24 L.Ed.2d 345 (1969)).

Additional legislative history regarding information and belief allegations comes from consideration of an amendment to H.R. 1058 (the version of the PSLRA from the House of Representatives), proposed by Congressman John Bryant, D–TX (the "Bryant Amendment"). Arguing against the requirement that plaintiffs state with particularity all facts on which their beliefs are formed, Representative Bryant expressed concern that

> at the beginning of the case plaintiff would have to set forth "with specificity all information," they have to give all the information in advance that forms the basis for the allegations of the plaintiff, meaning any whistle-blower within a securities firm involved would have to be uncovered in the pleadings in the very, very beginning.

141 Cong. Rec. H2848 (8 March 1995). Congressman John Dingell, D–MI, agreed and stated that H.R. 1058, if passed without the Bryant Amendment, would require plaintiffs "literally, in [their] pleadings, [to] include the names of confidential informants, employees, competitors, and others who have provided information leading to the filing of the case." 141 Cong. Rec. H2849 (8 March 1995). Despite such concerns, Congress rejected the Bryant Amendment. 141 Cong. Rec. H2848 (8 March 1995).

In *In re Silicon Graphics,* the District Court concluded that "because 'Congress does not intend sub silentio to enact statutory language that it has earlier discarded in favor of other language,' . . . plaintiffs must plead the sort of information described by Reps. Bryant and Dingell to meet the requirements of the [PSLRA] as enacted." 970 F.Supp. at 764 (quoting *Immigration & Naturalization Service v.*

*Cardoza–Fonseca,* 480 U.S. 421, 442–43, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987)). Moreover, in affirming the District Court in *In re Silicon Graphics,* the Ninth Circuit held that the "all facts" requirement for complaints pled on information and belief cannot be satisfied if plaintiffs fail to identify the sources upon which their belief is based. 183 F.3d at 984.

According to the Ninth Circuit, "[i]t is not sufficient for a plaintiff's pleadings to set forth a belief that certain unspecified sources will reveal, after appropriate discovery, facts that will validate [the plaintiff's] claim." *Id.* at 985; *see also In re Aetna,* 34 F.Supp.2d at 942–43 (adopting the District Court's analysis in *In re Silicon Graphics* and holding that "plaintiffs must state with particularity the sources of the facts that they allege on information and belief"); *In re Aetna, Inc. Sec. Litig.,* 1999 WL 354527, at *4 (E.D.Pa.26 May 1999) ("[T]he disclosure of the names and addresses of persons interviewed by Plaintiffs' counsel is consistent with the policy considerations underlying the [PSLRA].").

The Second Circuit, nevertheless, recently held that "plaintiffs who rely on confidential sources are not always required to name those sources, even when they make allegations on information and belief." *Novak v. Kasaks,* 216 F.3d 300, 313 (2d Cir.2000). In arriving at such a conclusion, the Second Circuit attempted to explain away the requirement that allegations on information and belief must be accompanied by a statement of "all facts on which that belief is formed." *Id.*

First, that Circuit stated that the identity of a confidential source is not a "fact." *Id.* According to the Second Circuit, "the applicable provision of the law as ultimately enacted requires plaintiffs to plead only facts and makes no mention of the sources of these facts." *Id.* The Second Circuit, nevertheless, failed to set forth any rea-

soning to support its conclusion that a source, including confidential informants, employees, competitors and others who provide information, is not a "fact." *See id.* Absent any support for such a proposition, it is difficult to perceive how a source does not constitute a "fact," especially in light of the rejection of the Bryant Amendment and the comments of Congressmen Bryant and Dingell. *See* pp. 305–06 *supra; see also Williams,* 529 U.S. at 431, 120 S.Ct. 1479. (the words of a statute are given their "ordinary, contemporary, [and] common meaning.").

Second, that Circuit inexplicably read the word "all" out of the statute. *Id.* at 314 n. 1. According to the Second Circuit, "[r]eading 'all' literally would produce illogical results that Congress cannot have intended." *Id.* Such a finding, however, appears to violate a basic tenet of statutory construction. As discussed, a statute must "be construed in such a fashion that *every word* has some operative effect." *Public Lands Council,* 529 U.S. at 746, 120 S.Ct. 1815 (quoting *Nordic Village,* 503 U.S. at 36, 112 S.Ct. 1011) (emphasis added).[12] The holding of the Second Circuit in *Novak,* therefore, appears to contradict the plain language of the PSLRA.[13]

In the Opposition Brief, the Plaintiffs for the first time allege that their allegations are based, in part, upon interviews with former, unnamed employees of Party City. Opposition Brief at 21. The Second Amended Complaint contains no such allegation. *See generally* Second Amended Complaint.

The Plaintiffs have not only failed to identify, by name, these "former employees," they have not "described [such sources] . . . with sufficient particularity to support the probability that a person in the position occupied by the source would posses the information alleged." *Novak,* 216 F.3d at 314. Therefore, any arguments based upon interviews with unnamed "former employees" need not be considered. *See In re Nice Systems,* 135 F.Supp.2d at 572 (holding that plaintiffs did not satisfy particularity requirement where plaintiffs' assertions were based, in part, on the statements of unnamed former employees).

■ As mentioned, moreover, in a case alleged on information and belief, plaintiffs are required to identify with particularity the contemporaneous information on which their claims are based. *See Wallace v. Systems & Computer Tech. Corp.,* No. 95–6303, 1997 WL 602808, at *12 (E.D.Pa.23 Sept.1997) ("Plaintiffs have not cited any contemporaneously existing information that should have been known to the defendants at the time the defendants made the challenged statements"); *see also Fishbaum v. Liz Claiborne, Inc.,* No. 98–9396, 1999 WL 568023, at *3 (2d Cir.1999); *San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.,* 75 F.3d 801, 812–13 (2d Cir.1996).

For example, in *Fishbaum,* the plaintiffs alleged that the defendants' statement that

---

**12.** Further indication that Congress intended to give the word "all" meaning stems from the fact that Congress included the word "all" in 15 U.S.C. § 78u–4(b)(1) but not in 15 U.S.C. § 78u–4(b)(2). *Compare* 15 U.S.C. § 78u–4(b)(1) ("the complaint shall state with particularity all facts") *with* 15 U.S.C. § 78u–4(b)(2) ("the complaint shall . . . state with particularity facts").

**13.** Although the Second Circuit held that "plaintiffs who rely on confidential sources are not always required to name those sources," the court stated that plaintiffs must still "describe[ ] [the sources] in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Novak,* 216 F.3d at 313–14.

"[m]anagement believes that present inventory levels are appropriate to support the currently anticipated sales levels" was false; plaintiffs alleged the defendants were aware of decreasing demand for the company's products and knew that diminished orders would leave the Company with excess inventory. 1999 WL 568023, at *2–3. In affirming the District Court's dismissal of the complaint, the Second Circuit held that

> the only allegations that evidence the existence of known adverse information contemporaneous with the purported false statements are plaintiffs' general assertions that Claiborne generated monthly and weekly internal reports on the company's performance and held weekly meetings with retail buyers.... [P]laintiffs do not identify specific reports or meetings, name the actors involved, or indicate the substance of the data or conversations. Their conclusory allegations on this point simply cannot withstand the close scrutiny Rule 9(b) requires.

*Id.* at *3.

In the present matter, the basis for the Plaintiffs' information and belief allegations are set forth in a single introductory paragraph which reads:

> Plaintiffs ... allege the following ... upon information and belief ... based upon, *inter alia,* the investigation made by and through their attorneys, which investigation included, *inter alia,* a review of the public documents and filings by the corporate defendant with the Securities and Exchange Commission ("SEC"), articles in the financial news media, press releases, and other publicly available information concerning Party City.

Second Amended Complaint at Preamble.

In *In re Aetna,* the court found a similar introductory paragraph insufficient under the PSLRA, observing that

> Plaintiffs' information and beliefs [sic] allegations ... provide little, if any, specificity about the foundation for their attorneys' allegations. In particular, Plaintiffs' allegations fail to indicate what [SEC] filings and analysts' reports on Aetna that Plaintiffs relied on. Moreover, Plaintiffs fail to identify what "other publications disseminated by defendants" and "other sources of information" were reviewed.

34 F.Supp.2d at 942; *see also In re Nice Systems,* 135 F.Supp.2d at 572 (information and belief allegations that fail to identify the source of the information do no satisfy the PSLRA's requirements); *In re Silicon Graphics,* 183 F.3d at 985 (same); *In re Health Management Sys. Inc. Sec. Litig.,* No. 97–1865, 1998 WL 283286, at *3 (S.D.N.Y. 1 June 1998) (merely setting forth an introductory paragraph purportedly detailing the basis for plaintiffs' information and belief allegations fails to satisfy the heightened pleading requirements of the Reform Act).

Likewise, in the present matter, the Plaintiffs' boilerplate introductory paragraph does not provide the particularity required under the PSLRA. Indeed, the Plaintiffs do not sufficiently identify the particular SEC filings and press releases that allegedly support their information and belief allegations.

The one article from the news media which the Plaintiffs do identify is an article by Herb Greenberg ("Greenberg") of *TheStreet.com,* published on the Internet on 19 March 1999 (the "19 March 1999 Greenberg Article"), in which Greenberg stated that "[Party City] was outta control!" *See* Second Amended Complaint at ¶¶ 27, 53 and 78. Such an opinion, however, does not constitute a legally adequate basis to charge Defendants with fraud dur-

ing the Class Period. Indeed, the Second Amended Complaint fails to set forth what Greenberg was referring to as having been "outta control."

Furthermore, the 19 March 1999 Greenberg Article appears to comment on the matters disclosed in the 19 March 1999 Press Release. *See* 19 March 1999 Greenberg Article. Greenberg's comments, therefore, pertain to conditions at Party City as they existed on 19 March 1999. As such, drawing inferences on the basis of this article, with respect to Party City's condition at times prior to 19 March 1999, appears to be nothing more than hindsight speculation. *See Wallace,* 1997 WL 602808, at *12 (requiring plaintiffs to cite contemporaneously existing information that should have been known to defendants at the time defendants made the challenged statements).

The Second Amended Complaint, moreover, refers to the 19 March 1999 Press Release[14] and the 1 October 1999 Form 10–K.[15] These disclosures, however, do not appear to provide support for Plaintiffs' allegations that Party City was "outta control." These disclosures address Party City's situation as of 19 March 1999 and 3 July 1999. Plaintiffs fail to allege how the information contained in the 19 March 1999 Press Release or the 1 October 1999 Form 10–K was inconsistent with anything stated in any of the public disclosures made during the Class Period.

As discussed, moreover, the Second Amended Complaint fails to identify any basis for the allegations that:

store personnel failed properly to enter merchandise into the computer inventory system, Second Amended Complaint at ¶ 30(c),

merchandise arrived at stores without bar-coded pricing stickers, *id.,*

small toy and party favor items were not scanned properly by high school and college aged cashiers, *id.,*

merchandise was given to customers free of charge, *id.,*

the volumes of unscanned or misscaned merchandise was sufficient to "render the Company's computerized inventory and sales figures misleading," *id.,*

Halloween merchandise was stored haphazardly, *id.* at ¶ 30(d),

Party City had difficulty tracking inventory at the end of the Halloween season, *id.,*

"on-hand" inventory discrepancies existed and were manually erased by "bringing the computer to zero," *id.* at ¶ 30(e),

the financial staff at Party City's corporate headquarters was "overwhelmed" and "unable to ensure that the appropriate checks and balances were in place and functioning appropriately," *id.* at ¶ 30(f), or

"massive amounts of paperwork" sent from the stores "sat in garbage bags and boxes," *id.*[16]

Indeed, Plaintiffs do not cite to a single document or provide the name of a single person who supposedly has information supporting these allegations. *See Wallace,*

---

**14.** In the 19 March 1999 Press Release, Party City disclosed that its year-end audit had been delayed due to "various difficulties associated with implementing new and upgrading existing financial reporting and accounting systems that were required, in part, to accommodate the substantial growth of its business." Second Amended Complaint at ¶ 76.

**15.** In the 1 October 1999 Form 10–K, Party City issued its financial results for the eighteen month period from 1 January 1998 through 3 July 1999. Second Amended Complaint at ¶¶ 81–83.

**16.** These allegations are incorporated by reference throughout the Second Amended Complaint.

1997 WL 602808, at *12 (finding that in a case alleged on information and belief, the plaintiffs are required to identify with particularity the contemporaneous information on which their claims are based). The Plaintiffs, therefore, have not set forth with particularity the facts upon which their information and belief allegations are based.

### iii. *Forward–Looking Statements*

▉ The PSLRA provides that there shall be no liability for a forward-looking statement where such statement is "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 78u–5(c)(1)(A)(i). Liability may be imposed for a forward-looking statement only where the plaintiff demonstrates that the statement was made with actual knowledge of its falsity. 15 U.S.C. § 78u–5(c)(1)(B); *see also In re Advanta*, 180 F.3d at 535–36.

A statement is forward-looking if it is a "statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items," "a statement of the plans and objectives of management for future operations" or "a statement of future economic performance." 15 U .S.C. § 78u–5(i)(1)(A), (B) and (C). In the present matter, many of the allegedly false and misleading statements appear to be forward looking. *See e.g.* Second Amended Complaint at ¶¶ 26, 31, 32, 35, 39, 45, 46, 52, 58, 60, 68, 71, 74.

For example, in paragraph 35 of the Second Amended Complaint, the Plaintiffs quote from the 9 July 1998 Press Release. *Id.* at ¶ 35. The 9 July 1998 Press Release announced financial information related to its second quarter sales results, commented on several new stores opened by Party City and stated the expectation of the company for continued sales growth in the future. *Id.* Such statements appear to be forward looking because they are statements "of the plans and objectives of management" and/or statements "of future economic performance." *See e.g. In re Advanta*, 180 F.3d at 536 (statement regarding company's expectation of increase in revenues is a forward-looking statement).

As mentioned, the PSLRA provides that there shall be no liability for a forward-looking statement where such statement is "accompanied by meaningful cautionary [language]." 15 U.S.C. § 78u–5(c)(1)(A)(i). In *In re Donald J. Trump Casino Sec. Litig.*, 7 F.3d 357 (3d Cir.1993), the Circuit found the following cautionary language sufficient:

> The Taj Mahal has not been completed and, accordingly, has no operating history. The Partnership, therefore, has no history of earnings and its operations will be subject to all of the risks inherent in the establishment of a new business enterprise. . . . The Taj Mahal will be the largest casino/hotel complex in Atlantic City, with approximately twice the room capacity and casino space of many of the existing casino/hotels in Atlantic City. [No] other casino/hotel operator has had experience operating a complex the size of the Taj Mahal in Atlantic City. Consequently, no assurance can be given that, once opened, the Taj Mahal will be profitable or that it will generate cash flow sufficient to provide for the payment of the debt service.

*Id.* at 370.

Similarly, in the present matter, each of the forward looking statements were accompanied by the following cautionary language:

Except for historical information contained herein, the statements in this release are forward-looking and made pursuant to the safe harbor provisions of the [PSLRA]. Forward-looking statements involve known and unknown risks and uncertainties, which may cause the Company's actual results in future periods to differ materially from forecasted results. Those risks include, among other things, the competitive environment in the party goods industry in general and the Company's specific market areas, inflation, changes in costs of goods and services and economic conditions in general. Those and other risks are more fully described in the Company's filings with the [SEC].

23 April 1998 Press Release, attached as Ex. I to the Greiner Aff.; *see also* Greiner Aff., Exhs. J, K, M, N, O, Q, R, S, and T. The inclusion of such cautionary language appears to "render[ ] the alleged omissions or misrepresentations immaterial as a matter of law." *In re Donald J. Trump Casino*, 7 F.3d at 371.

■ The Defendants, moreover, cannot be held liable for forward-looking statements absent specific allegations of actual knowledge of falsity. *See In re Advanta*, 180 F.3d at 539 (finding that statement was protected by the safe-harbor provision where plaintiffs failed to plead facts sufficient to demonstrate that the disputed statement was made with "actual knowledge" of its falsity).

In the present matter, the Plaintiffs simply state that the Defendants "knew or should have known" of the alleged falsity of the statements. Second Amended Complaint at ¶¶ 27, 30, 34, 38, 41, 43, 49, 51, 53, 57, 59, 63, 67, 70, 73 and 75. Such a conclusory allegation, however, is insufficient. *See In re Advanta*, 180 F.3d at 539 (plaintiffs "may not rest on a bare infer-

ence that a defendant 'must have had' knowledge of the facts") (citation omitted).

b. *15 U.S.C. § 78u–4(b)(2)—Scienter*

As discussed, in order to survive the Motion to Dismiss, the Plaintiffs must "state with particularity facts giving rise to a strong inference that [the Defendants] acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2); *Oran*, 226 F.3d at 288. The Defendants contend that the Plaintiffs have not pleaded facts sufficient to give rise to a "strong inference" of scienter. Moving Brief at 25.

In *In re Advanta*, the Third Circuit held that the PSLRA essentially adopted the pre-PSLRA Second Circuit standard for pleading scienter, which required allegations that gave rise to a "strong inference" of fraudulent intent. 180 F.3d at 533–34. Previously, that could be accomplished in the Second Circuit by alleging facts to show that defendants had both motive and opportunity to commit fraud, or by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness. *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 268–69 (2d Cir. 1993) (citations omitted).

As discussed, a key Congressional objective in passing the PSLRA was to "establish ... *more stringent* pleading requirements" than had been imposed by the Courts of Appeals under Rule 9(b). H.R. Conf. Rep. No. 104–369, at 41, reprinted in 1995 U.S.C.C.A.N. 730, 740 (emphasis added). Specifically, Congress declared:

The Conference Committee language is based *in part* on the pleading standard of the Second Circuit.... Regarded as the most stringent pleading standard, the Second Circuit requirement is that the plaintiff state facts with particularity, and that these facts must, in turn, give rise to a "strong inference" of the defendant's fraudulent intent. *Because*

*the Conference Committee intends to strengthen existing pleading requirements, it does not intend to codify the Second Circuit's case law interpreting this pleading standard....* For this reason, the Conference Report chose not to include in the pleading standard certain language relating to motive, opportunity, or recklessness.

*Id.* at 41 & n. 23, reprinted in 1995 U.S.C.C.A.N. at 740 & n. 23 (emphasis added). President Clinton, moreover, vetoed the PSLRA on the grounds that it imposed excessively stringent pleading requirements:

> I believe that the pleading requirements of the Conference Report with regard to a defendant's state of mind impose an unacceptable procedural hurdle to meritorious claims being heard in Federal courts. I am prepared to support the high pleading standards of the U.S. Court of Appeals for the Second Circuit—the highest pleading standard of any Federal circuit court. But the conferees make crystal clear in the Statement of Managers their intent to raise the standard even beyond that level. I am not prepared to accept that.

141 Cong. Rec. H15214 (daily ed. 20 Dec. 1995) (veto message of President Clinton). Both houses of Congress subsequently overrode the President's veto and the PSLRA was enacted into law without changes to the statutorily enhanced pleading standard.

■ The Third Circuit in *In re Advanta*, nevertheless, found the legislative history of the PSLRA "contradictory and inconclusive." 180 F.3d at 533. According to the Third Circuit, the use of the "strong

inference" language in the statute is sufficient evidence that Congress intended to codify the Second Circuit standard. *Id.* at 533–34; *but see Greebel,* 194 F.3d at 194–97 (holding that the PSLRA imposes a more rigorous pleading standard than applied by any of the Courts of Appeals prior to the enactment of the statute); *In re Comshare, Inc. Sec. Litig.,* 183 F.3d 542, 549–51 (6th Cir.1999) (same); *In re Silicon Graphics,* 183 F.3d at 979 (same); *Bryant v. Avado Brands, Inc.,* 187 F.3d 1271, 1282–87 (11th Cir.1999) (same). Therefore, pursuant to the law of this Circuit, the Plaintiffs may establish a "strong inference" of scienter by either " 'alleging facts to show that defendants had both motive and opportunity to commit fraud' " or " 'by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.' " *Oran,* 226 F.3d at 288–89 (quoting *In re Burlington Coat Factory,* 114 F.3d at 1418); *see also In re Advanta,* 180 F.3d at 534–35.[17]

### i. Motive and Opportunity

■ As mentioned, the Third Circuit permits allegations of scienter based upon a showing of motive and opportunity. *Oran,* 226 F.3d at 288; *Greebel,* 194 F.3d at 197 ("Like the Third Circuit, we caution that 'catch-all allegations that defendants stood to benefit from wrongdoing and had the opportunity to implement a fraudulent scheme' are not sufficient to plead scienter.") (citing *In re Advanta,* 180 F.3d at 535); *In re Burlington Coat Factory,* 114 F.3d at 1418, 1422. Motive "entail[s] concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged." *Ganino*

---

17. In *Novak,* the Second Circuit recently held that the PSLRA "did not change the basic pleading standard for scienter in [the Second Circuit]." 216 F.3d at 311. The Second Circuit acknowledged, however, that the PSLRA did not adopt the "motive and opportunity" language from prior Second Circuit case law. *Id.* Nevertheless, according to the Second Circuit, prior case law may be helpful in applying the "strong inference" standard. *Id.*

*v. Citizens Utilities Co.*, 228 F.3d 154, 170 (2d Cir.2000) (quoting *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1130 (2d Cir. 1994)).

The Plaintiffs allege that insider stock sales provided a motive for the Individual Defendants to commit securities fraud.[18] Second Amended Complaint at ¶ 89; Opposition Brief at 33. The Plaintiffs further allege that the Individual Defendants committed fraud in order to "protect and enhance their executive positions and the substantial compensation and prestige they obtained thereby." Second Amended Complaint at ¶ 89. Finally, the Plaintiffs allege that scienter can be imputed to the Individual Defendants because they engaged in a scheme to "allay investor concerns and the Company's primary lender's concerns about the Company's financial problems." *Id.*

■ Stock sales may support an inference of scienter only if such sales were "unusual in scope or timing." *Oran*, 226 F.3d at 290 (citing *In re Advanta*, 180 F.3d at 540); *see also In re Burlington Coat Factory*, 114 F.3d at 1424 (plaintiffs "must allege that the trades were made at times and in quantities that were suspicious enough to support the necessary strong inference of scienter"); *Leventhal v. Tow*, 48 F.Supp.2d 104, 115 (D.Conn.1999) (allegation that defendants' "motive was to artificially inflate [the] stock price ... in order to get more favorable terms in [ ] stock-for-stock transactions and issuance of debentures [is] insufficient to establish scienter and [is] routinely rejected by the courts"). Moreover, "causing temporary inflations of price through the dissemination of false information hurts the long-term stock price of the company and thereby presumably hurts managerial compensation." *In re Burlington Coat Factory*, 114 F.3d at 1423 n. 12; *see also Melder v. Morris*, 27 F.3d 1097, 1102–03 (5th Cir.1994) ("[P]laintiffs' allegation of motive—basically that the defendant officers and directors were motivated by incentive compensation—would effectively eliminate the state of mind requirement as to all corporate officers and defendants."); *Malin v. Ivax Corp.*, 17 F.Supp.2d 1345, 1361 (S.D.Fl.1998) (motive of maintaining stock price in order to "maintain the reputation of the company and facilitate mergers and acquisitions" held insufficient "[b]ecause such motives can be ascribed to virtually all corporate officers and directors").

### (a) *Timing and Scope*

As mentioned, the Plaintiffs allege the stock sales by Lauber and Mandell were suspicious in both timing and scope. Second Amended Complaint at ¶¶ 89–91. According to the Plaintiffs, the stock sales took place after public announcements, such as announcements of monthly sales and the filing of Form 10–Qs with the SEC. *Id.* at ¶¶ 90–91. In addition, the Plaintiffs contend that the amounts of the sales were suspicious in relation to the Individual Defendants' salaries. *Id.*

■ Trading following public announcements simply evidences compliance with the securities laws. *See Deutschman v. Beneficial Corp.*, 841 F.2d 502, 506 (3d Cir.1988). Indeed, insiders are only permitted to trade in a "window" after a public announcement is made. *Id.*

---

**18.** As mentioned, Lauber sold all of his Party City Stock during the Class Period. Second Amended Complaint at ¶ 90. Lauber realized more than $2 million in proceeds from such sales. *Id.* In addition, Mandell sold 125,000 share of Party City Stock during the Class Period. *Id.* at ¶ 91. Mandell realized more than $2.8 million in proceeds from such sales. *Id.*

■ It appears, moreover, that Mandell's trading during the Class Period was consistent with his stock sales in previous years. *See* Cross Aff. at Exhs. A–H. *See In re Advanta*, 180 F.3d at 541 (dismissing complaint because plaintiffs made "no reference to the previous trading practices"). In addition, Lauber's sales took place in March, November and December, 1998— twelve, four and three months, respectively, before Party City announced its inability to complete the year-end audit. *See* Colyer Aff. at Exhs. 1–4. A broad temporal distance between stock sales and a disclosure of bad news defeats any inference of scienter. *See e.g. In re Green Tree*, 61 F.Supp.2d at 873–74 (no motive where a defendant sold two weeks prior to negative announcement); *Head v. Net-Manage*, No. 97–4385, 1998 WL 917794, at *4 (N.D.Cal.30 Dec.1998) (sales two months before announcement not suspicious). It appears, moreover, that many of Lauber's sales took place in November, well after the stock had reached its Class Period high and begun to decline in value. *See* Greiner Aff. at Ex. V. *See Greebel*, 194 F.3d at 188 (failure to sell at the top of stock price militates against inference of scienter).

In addition, the allegation that the scope of the sales supports an inference of scienter appears to be equally without merit. As mentioned, the Plaintiffs allege that the amounts of the sales were suspicious in relation to the Individual Defendants' salaries. Second Amended Complaint at ¶¶ 90–91. The Circuit, however, has recognized that stock options are commonly an important part of compensation packages, and refused to impute scienter based on sales of such shares. *See In re Advanta*, 180 F.3d at 541 ("Although the profits realized by the defendants were significant relative to their base salaries, these proceeds were the result of accumulated stock options and were an intended part of their overall compensation package"); *In re Burlington Coat Factory*, 114 F.3d at 1424 ("A large number of today's corporate executives are compensated in terms of stock and stock options. It follows then that these individuals will trade those securities in the normal course of events.") (citations omitted).

■ In addition, Mandell sold less than five percent of his Party City Stock during the Class Period.[19] While Lauber allegedly sold 100 percent of his shares of Party City Stock during the Class Period,[20] Mandell and Lauber only sold approximately eight percent of their combined holdings. Moving Brief at 33 (citing Colyer Aff., Exhs. 1–4). Low aggregate sales and large retained aggregate holdings rebut an inference of motive, even where some defendants have sold significant percentages. *See In re Advanta*, 180 F.3d at 541 ("Far from supporting a 'strong inference' that defendants had a motive to capitalize on artificially inflated stock prices, [retained holdings] suggest [that] they had every incentive to keep Advanta profitable"); *In re Silicon Graphics*, 183 F.3d at 987–88 (where collective retention by all defendants aggregated 90%, no motive stated by individual's sales of 43.6%); *San Leandro*, 75 F.3d at 813–14 (where insiders retained holdings, sales did not constitute scienter); *In re Glenayre Tech., Inc. Sec. Litig.*, No.

---

19. When the Class Period began, Mandell held 2,582,500 shares of Party City Stock, Cross Affidavit, Ex. D, and when it ended, he held 2,457,500. *Id.*, Ex. H.

20. The Plaintiffs allege that Lauber sold 101,-500 shares during the Class Period. Second Amended Complaint at ¶ 89. The Defendants, however, have submitted proof in the form of various SEC filings which appear to demonstrate that Lauber actually sold 91,500 shares during the Class Period. Colyer Aff., Exhs. 1–4.

96–8252, 1998 WL 915907, at *4 (S.D.N.Y.30 Dec.1998) (sales totaling only 5% of defendants' cumulative holdings militates against an inference of scienter).

The Plaintiffs, moreover, place emphasis on the allegation that Lauber sold all of his Party City Stock during the Class Period. Opposition Brief at 33–34. Nevertheless, the fact that Lauber may have sold all of his Party City Stock during the Class Period is insufficient, by itself, to support scienter. *See e.g. Head,* 1998 WL 917794, at *3–5 (no inference of scienter, even though one defendant sold 100% of holdings and two others sold 95% and 76%, respectively, where all defendants collectively sold only 5% of holdings). As discussed, Mandell and Lauber only sold approximately eight percent of their combined holdings. Moving Brief at 33 (citing Colyer Aff., Exhs. 1–4).

#### (b) *Incentive Compensation*

As mentioned, the Plaintiffs also allege that the Individual Defendants committed fraud in order to "protect and enhance their executive positions and the substantial compensation and prestige they obtained thereby." Second Amended Complaint at ¶ 89.

In *In re Burlington Coat Factory,* the Circuit held that a nearly identical allegation was inadequate because "[the plaintiffs] fail[ed] to explain ... how a temporary inflation of [the Burlington Coat Factory] stock price would help management increase its compensation or preserve its jobs." 114 F.3d at 1423 n .12. Likewise, in the present matter, the Plaintiffs do not explain how a temporary inflation of the Party City Stock price would help "protect and enhance [the Individual Defendants'] executive positions and the substantial compensation and prestige they obtained thereby." Second Amended Complaint at ¶ 89.

Incentive compensation, moreover, "can hardly be the basis on which an allegation of fraud is predicated." *Shields,* 25 F.3d at 1130; *see also Tuchman v. DSC Communications Corp.,* 14 F.3d 1061, 1068–69 (5th Cir.1994) ("It does not follow that because executives have components of their compensation keyed to performance, one can infer fraudulent intent"). Indeed, if such an allegation was sufficient to meet a plaintiff's pleading burden, "virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions." *Acito v. IMCERA Group, Inc.,* 47 F.3d 47, 54 (2d Cir.1995). It appears, therefore, the Plaintiffs cannot demonstrate scienter by alleging that the Individual Defendants committed fraud in order to "protect and enhance their executive positions and the substantial compensation and prestige they obtained thereby." Second Amended Complaint at ¶ 89; *see In re Burlington Coat Factory,* 114 F.3d at 1423 n. 12.

#### (c) *Desire for Strong Financials*

As mentioned, the Plaintiffs claim that scienter can be imputed to the Individual Defendants because they engaged in a scheme to "allay investor concerns and the Company's primary lender's concerns about the Company's financial problems." Complaint at ¶ 89. Such an allegation, however, is insufficient to allege scienter.

The desire to satisfy investors and lenders as to a company's financial soundness is insufficient, by itself, to demonstrate scienter. *See San Leandro,* 75 F.3d at 813 (desire to pay less interest on debt through maintenance of artificially inflated credit rating states no actionable motive); *In re Green Tree,* 61 F.Supp .2d at 874 ("[T]he desire to maintain a high credit rating is insufficient alone to support an

inference of motive because virtually every company wants to maintain such a rating."); *High View Fund, L.P. v. Hall*, 27 F.Supp.2d 420, 427 (S.D.N.Y.1998) (rejecting allegation "that defendants were motivated by a desire to maintain their company's credit rating"). Indeed, every public company seeks to satisfy its investors and lenders by demonstrating its financial soundness.

The Plaintiffs, moreover, provide no support for their conclusory allegation that scienter can be imputed to the Individual Defendants because they engaged in a scheme to "allay investor concerns and the Company's primary lender's concerns about the Company's financial problems." Complaint at ¶ 89. It appears, therefore, the Defendants' desire for strong financials cannot be a basis for alleging scienter. *See e.g. Salinger v. Projectavision*, 972 F.Supp. 222, 233 (S.D.N.Y.1997) ("It is not sufficient ... [to allege] an abstract desire to enable the company to continue to enjoy high stock price and thereby ease the difficulties of raising additional capital").

The Plaintiffs, therefore, have failed to allege particularized facts which give rise to a strong inference of scienter based on motive and opportunity. 15 U.S.C. § 78u–4(b)(2); *see also In re Advanta*, 180 F.3d at 535.

### ii. *Conscious or Reckless Behavior*

■ A strong inference of fraudulent intent may be established by "alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *In re Carter–Wallace, Inc. Sec. Litig.*, 220 F.3d 36, 39 (2d Cir.2000) (citing *Shields*, 25 F.3d at 1128; *In re Advanta*, 180 F.3d at 535).

■ To survive dismissal, the Plaintiffs must allege "reckless conduct by the [Defendants] which is 'at the least,

conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the [Defendants] or so obvious that the [Defendants] must have been aware of it.' " *In re Carter–Wallace*, 220 F.3d at 39 (citing *Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d 38, 47 (2d Cir.1978)). "It is sufficient for [the Plaintiffs] to allege 'defendants' knowledge of facts or access to information contradicting their public statements.' " *In re Carter–Wallace*, 220 F.3d at 40 (quoting *Novak*, 216 F.3d at 308). "An egregious refusal to see the obvious, or to investigate the doubtful, may in some cases give rise to an inference of recklessness." *In re Carter–Wallace*, 220 F.3d at 40 (citing *Chill v. General Elec. Co.*, 101 F.3d 263, 269 (2d Cir. 1996)).

■ With regard to each disclosure alleged to have been false or misleading, the Second Amended Complaint states that such

> statements ... were materially false and misleading and lacked any reasonable basis because, as defendants knew (or were reckless in not knowing) and failed to disclose to the investing public, the Company's internal financial and accounting systems had failed to keep up with the Company's rapid and aggressive expansion of stores and were not functioning in a manner so as to produce reliable and accurate financial results in accordance with GAAP.

*See* Second Amended Complaint at ¶¶ 27, 30, 34, 38, 41, 43, 49, 51, 53, 57, 59, 63, 67, 70, 73, 75. Nevertheless, "[a] plaintiff cannot simply couple [ ] factual statement[s] with [ ] conclusory allegation[s] of fraudulent intent to adequately plead scienter." *Sunquest Information Systems, Inc. v. Dean Witter Reynolds, Inc.*, 40 F.Supp.2d

644, 661 (W.D.Pa.1999); *see also In re Advanta*, 180 F.3d at 539 (allegation that defendants acted "knowingly" is insufficient); *Allison v. Brooktree Corp.*, 999 F.Supp. 1342, 1353–54 (S.D.Cal.1998) ("Simply alleging that defendants knew the statements to be false, and therefore defendants must have acted recklessly, circumvents the requirement that plaintiffs plead a strong inference of scienter.").

In *Sunquest*, the plaintiffs alleged the following:

Dean Witter made [its] material misrepresentations and omissions to Sunquest with reckless disregard for the truth or with intention of deceiving and inducing Sunquest to take actions that would benefit ... Dean Witter, and to induce Sunquest to enter into a purchase of Antrim's stock for an excessive price.

40 F.Supp.2d at 661. The *Sunquest* court held that "this conclusory recitation" was insufficient to demonstrate conscious or reckless conduct on the part of Dean Witter. *Id.*

In the present matter, the Plaintiffs' conclusory assertion that "defendants knew (or were reckless in not knowing) ... the Company's internal financial and accounting systems ... were not functioning in a manner so as to produce reliable and accurate financial results in accordance with GAAP" is likewise insufficient to demonstrate conscious or reckless conduct on the part of the Defendants. *Id.; see also In re Advanta Sec. Litig.*, No. 97–4343, 1998 WL 387595, at *8 (E.D.Pa. 9 July 1998) (dismissing as insufficient "[p]laintiff's catch-all allegation that all speakers knew that their statements were false when made").

The Plaintiffs, nevertheless, further argue that their scienter allegations are supported by the fact that there were "serious problems and defects" with the inventory management systems and Party City was "unable to [timely] complete the Company's inventory evaluation and file audited financial statements." Opposition Brief at 27. According to the Plaintiffs, because the audit was delayed, the Defendants must have known about the "serious problems" prior to making the allegedly false and misleading statements. *Id.*

The Plaintiffs also argue that the "Company's inventory management systems were absolutely critical to the overall performance of the Company." *Id.* Because the Individual Defendants were "principal executives," the Plaintiffs contend that the Individual Defendants "can be charged with knowledge" of deficiencies in the inventory management systems. *Id.* at 26–28.

The Plaintiffs cannot allege scienter by simply stating that the Defendants must have known that there were "serious problems" with the inventory management systems because the audit was delayed. *See In re Advanta*, 180 F.3d at 539 ("It is well established that a pleading of scienter may not rest on a bare inference that a defendant must have had knowledge of the facts.") (citation and internal quotations omitted).

In addition, the argument that the Individual Defendants must have had knowledge of deficiencies in the inventory management systems because they were "principal executives" and the "inventory management systems were absolutely critical to the overall performance of the Company," is also insufficient to allege scienter. *See id.* (blanket assertions that defendants must have been aware of impending losses by virtue of their positions within the company are insufficient to plead scienter); *Maldonado v. Dominguez*, 137 F.3d 1, 10 (1st Cir.1998) (allegations that defendant, "because of his position with the company, 'must have known'

a statement was false or misleading are precisely the types of inferences which [courts], on numerous occasions, have determined to be inadequate to withstand Rule 9(b) scrutiny").

The Plaintiffs, therefore, do not allege particularized facts sufficient to give rise to a strong inference that the Defendants knew the alleged misrepresentations were false when uttered, or that the conduct of the Defendants in issuing the various press releases and SEC filings was "highly unreasonable." *In re Carter–Wallace*, 220 F.3d at 39.

The Plaintiffs do not allege specific "facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness" on the part of Defendants. *In re Carter–Wallace*, 220 F.3d at 39; *In re Advanta*, 180 F.3d at 535. The Plaintiffs were required to plead with factual particularity how the representations by the Defendants were misleading at the time they were made. *In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1547–48 n. 7 (9th Cir. 1994); *Wallace*, 1997 WL 602808, at *16. The Plaintiffs have failed to do this. The allegations made by the Plaintiffs, therefore, are insufficient to produce a strong inference of fraudulent intent by the Defendants.

### 4. The Control Person Claims

In the Second Amended Complaint, Plaintiffs allege the Individual Defendants violated Section 20(a) "by virtue of their high-level positions" at Party City. Second Amended Complaint at ¶ 104. Section 20(a) provides for secondary liability of "control persons." 15 U.S.C. § 78t.[21] In order to maintain a cause of action for control person liability under Section 20(a), a plaintiff is required to establish:

> (1) an underlying violation by a controlled person or entity; (2) that the defendants are controlling persons; and (3) that they were in some meaningful sense culpable participants in the fraud.

*Boguslavsky v. Kaplan*, 159 F.3d 715, 720 (2d Cir.1998); *see also In re Cendant Corp. Sec. Litig.*, 81 F.Supp.2d 550, 558 (D.N.J.2000).

■ Liability under Section 20(a) is predicated upon an independent violation of "this chapter or the rules or regulations thereunder." 15 U.S.C. § 78t–1(a); *Greebel*, 194 F.3d at 207. Claims under Section 20(a), therefore, are "derivative—requiring proof of a separate underlying violation of the Exchange Act." *In re Milestone Scientific Sec. Litig.*, 103 F.Supp.2d 425, 474 (D.N.J.2000); *see also In re Advanta*, 180 F.3d at 541; *Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co., Inc.*, 32 F.3d 697, 703 (2d Cir.1994) ("[T]o state a claim under [Section] 20(a), a plaintiff must plead a predicate violation of the '34 Act [sic] or its rules and regulations."). Because the Plaintiffs have not pleaded a predicate violation of Section 10(b) or Rule 10b–5, the Section 20(a) claim must be dismissed.

### Conclusion

■ For the reasons stated, the Motion to Dismiss is granted. The Second

**21.** Section 20(a) provides, in relevant part:

(a) Joint and several liability; good faith defense. Every person who, directly or indirectly, controls any person liable under any provision of this title or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a).

**318**

Amended Complaint is dismissed, with prejudice.[22]

22. Pursuant to Rule 15(a) of the Federal Rules of Civil Procedure, "leave [to amend] shall be freely given when justice so requires." Fed.R.Civ.P. 15(a). A District Court, nevertheless, "may deny leave to amend on the grounds that amendment would cause undue delay or prejudice, or that amendment would be futile." *Oran*, 226 F.3d at 291 (citations omitted).

As discussed, on or about 27 October 1999, the Defendants notified the Plaintiffs of their intent to move to dismiss the Consolidated Amended Complaint. 27 October 1999 Letter, attached as Ex. B to the Greiner Aff. The Plaintiffs responded that they would "stand firm" on the Consolidated Amended Complaint. 3 November 1999 Letter, attached as Ex. E to the Greiner Aff.

On 3 December 1999, the Defendants served their motion to dismiss. In their opposition to the motion to dismiss, the Plaintiffs included a footnote asking for leave to amend the Consolidated Amended Complaint in the event the motion to dismiss were granted. Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss at 38 n. 12, attached as Ex. W to the Greiner Aff.

As mentioned, a status conference was held on 22 February 2000. At the 22 February 2000 Status Conference, the Plaintiffs stated that they had developed information which they believed warranted further amendment to the Consolidated Amended Complaint. The Plaintiffs were subsequently granted leave to file the Second Amended Complaint.

With regard to the present Motion to Dismiss, the Plaintiffs *have not sought leave to amend the Second Amended Complaint.* It appears, moreover, that any further attempts to amend would be futile. *See Oran,* 226 F.3d at 291 (upholding District Court's denial of plaintiffs' request for leave to amend where plaintiffs had already amended their complaint once, the case was one and one-half years old and no discovery had been taken).